ESTATE OF JAMES (Ethel) : JAMES (Earl), Appellant, vs. KERLEY, Executrix, Respondent.

*May 3—June 8, 1954.*

For the appellant there was a brief by *Jeffris, Mouat, Oestreich, Wood & Cunningham,* and oral argument by *Harry F. Knipp,* all of Janesville.

For the respondent there was a brief by *Mistele & Smith* of Jefferson, and oral argument by *Lynn H. Smith.*

STEINLE, J.   The judgment disposes of the claims of both parties.  The issues of fact presented in the court below were numerous.  The questions raised on this appeal are:

1. Is the award of the personal property on the James farm to the executrix of the Ethel James estate contrary to the facts established by the evidence?

2. Should the situation herein involved be resolved on the same basis as if two unrelated owners of adjoining farms with personal property had mixed up their business affairs as did this husband and wife and then terminated the arrangement by death or otherwise?

3. Should Earl James have received credit for any items of cash and property in addition to the $1,500 allowed by the court?

4. Was Earl James properly charged $800 for four head of cattle claimed by the executrix to be unaccounted for by James at the auction sale?

The appellant's challenge, especially of the court's determination of fact issues, compels a careful consideration of the court's findings and conclusions.

The learned trial court found:

"1. That the deceased, Ethel James, formerly Ethel Kerley, and the respondent Earl James, were married in November, 1947, the said Ethel Kerley then being a widow and the respondent a middle-aged bachelor. At that time the deceased owned a farm in the town of La Grange, Walworth county, Wisconsin, which she operated and resided upon since 1943 and for which farm she paid $10,500. At the time of her marriage this farm was subject to a mortgage of $8,700.

"2. That at the time of her marriage she owned 19 milk cows, four to five bred heifers, and some calves together with farm machinery adequate to work the 88 tillable acres of said farm; some of the machinery was purchased secondhand and some was bought new. This livestock and machinery together with all of her household furniture was moved to the James farm at or about the date of her marriage. Subsequently a quantity of silage and other feed for the animals was also moved to the Earl James farm.

"3. That on the date of the marriage Earl James owned a farm in the town of Cold Spring, Jefferson county, Wisconsin, which he acquired in October, 1947, at a cost of $14,000, and upon which there was a mortgage of $5,800. He also owned a residence in the city of Whitewater, Wisconsin, a note of $1,500 from R. Hoeppner which note was paid to Earl James soon after the marriage and also owned four shares of stock with a par value of $10 per share but of an unknown value. He had no farm machinery except a steel-wheel wagon; that there was an unknown quantity of hay in his barn but no other feed except a small quantity of silage of doubtful quality.

"4. That the said Earl James at the time of his marriage and during the married life of the parties was exclusively engaged in buying and selling cattle and trucking livestock to market; that the deceased managed and operated both farms when said farms were not share rented; that she, her children, and occasionally some hired help performed the

manual labor required in the operation of said farms. The respondent assisted in the farmwork only to a minor degree.

"5. That Earl and Ethel James with the children of Mrs. James by a former marriage, Elean, William, and Marguerite Kerley, then aged, respectively, about nineteen, eighteen, and fifteen years, resided together on the James farm from November, 1947, until October, 1948, at which time William Kerley moved to his mother's farm, operating it on a 40–60 basis until shortly before his induction into the army on January 10, 1949. In April, 1949, Mr. and Mrs. James and the two girls moved to the Kerley farm, remaining there until September, 1951, at which time all of the family with the exception of William, returned to the James farm and resided there until the decease of Ethel James on July 23, 1952. The farm which was not occupied by the family was rented on a share-crop basis and the receipts from the rented farm were usually deposited in the Earl James account or held in cash and used for farm or household purposes.

"6. Prior to the marriage the deceased managed her affairs without a bank account and after marriage she had almost exclusive control of the financial affairs which concerned both farms. Earl James at the time of the marriage had a checking account in the Whitewater Commercial & Savings Bank, and after marriage funds from the farms and from his trucking operations were deposited indiscriminately in this checking account and both parties drew checks upon said account appending the signature of Earl James to all of said checks. That although the checks were so drawn the bank officials regarded it as the joint account of the parties and the passbook to which the bank officials attached the words 'Mr. or Mrs.' was used jointly by both parties. That this banking situation continued until 1950 when the deceased opened a checking account in her own name which was used by her in addition to the joint account of the parties; that she also had a savings account in the joint names of herself and her daughter, Elean Kerley, in which was deposited the sum of $2,000 being the proceeds of a settlement which she received for personal injuries sustained in an automobile accident. That from time to time the deceased borrowed funds from the Whitewater Commercial & Savings Bank which were used to finance farm operations.

"7. That in the spring of 1948 the deceased started to build up the herd of cattle which she brought to the Earl James farm by purchase of additional cattle. Except for a part of the money which Earl James received from the payment of the R. Hoeppner note such cattle were acquired from funds borrowed by Ethel James or by credit extended to her on her promissory notes. Later she acquired other additions to the herd for cash and credit and also some cattle were added to the herd from offspring of the herd. That Earl James never in any way obligated himself to pay for such cattle nor did he obligate himself to pay for machinery purchased or household expenses.

"8. That most, if not all, of the after-acquired farm machinery was purchased by the deceased and such purchases were charged to the deceased and when promissory notes were given they were signed by Ethel James alone. That said Ethel James at various times gave promissory notes either for money used to purchase cattle and machinery or purchase-money notes for cattle and machinery in sums of from $500 to $3,500 and aggregating over $15,000.

"9. That the milk checks from both farms were made payable to the deceased and in one instance when a change was made in the creamery receiving milk from said farms one or two checks were first made payable to Earl James but as soon as the error was noted all future checks were made payable to deceased.

"10. That deceased ordered and paid for the necessary repairs, taxes, and insurance on both farms as well as the household expenses and other expenses pertaining to farm operations.

"11. That for the years 1948–1951, inclusive, the parties filed separate income-tax returns and on such returns the deceased charged herself with all of the revenues produced by both farms and took credit for the expenses and losses occasioned in such farm operations. That respondent made no objection to this practice upon her part and in his returns he reported only the income and disbursements connected with his cattle-buying and trucking business.

"12. That deceased was not associated with nor interested in the operation of Earl James' trucking and cattle business which he carried on during all of their married life.

"13. That as a result of the deceased's management, operation, and control of the farms the herd and machinery which were originally brought by her to the Earl James farm was substantially improved both qualitatively and quantitatively so that at her death the personal property on said farms consisted of the articles as shown upon the inventory and appraisal filed in said estate. That one bull and a pickup truck on the Earl James farm was the property of Earl James.

"14. That the parties at no time ever entered into any formal agreement in respect to the ownership of property on said farms nor as to any division of proceeds therefrom; that in family discussions at which both parties were present the cattle and farm personal property were always referred to as 'her cattle' and 'her machinery.'

"15. That the net average income of the respondent as reported in his income-tax returns for the period of the marriage was less than $700 per year and was insufficient for the support of both himself and his wife.

"16. That from the income of the two farms the mortgage on respondent's farm was reduced by $800 and the taxes thereon, interest, and repairs were also paid therefrom; that two new silos were added to his farm costing about $1,600 and paid from farm income; a garage was erected on his farm at an undetermined cost but at least $85 of said cost was shown to have been paid from farm income; that siding on the barn on his farm amounted to $400 and was paid from farm income; that flooring, plastering, and electrical work in the house on his farm costing $350 was paid from farm income. In addition cement work in the barn, insulation of the milk house, painting, papering, and linoleum for the dwelling on his farm were paid for from farm income but the cost thereof was not determined.

"17. That the deceased operated the Earl James farm with good husbandry and this together with the improvements made upon the farm enabled the respondent to sell his farm in the fall of 1952 for $25,000. That the profit realized was not due to inflation but to good management and improvements and additions.

"18. That additions and improvements were also made to deceased's property which were to some extent paid for from

farm income; that a small four-room house was built on deceased's farm by a tenant laborer and to which at least $1,300 was paid from joint funds and $700 was contributed by deceased's son, William Kerley; that much of the labor on said house was performed by a hired man on the Ethel James farm and his father. Claims have been filed against the Ethel James estate for such labor in the amount of $840; also a small addition was made to the barn on her farm and apparently paid from farm funds; the cost of this addition is unknown; that no objection by respondent was shown to have been made to the use of said funds for such improvements.

"19. That the household furniture brought to the Earl James farm by deceased has to some extent been replaced and has also deteriorated by use; that the davenport and chair was purchased by the deceased from her own funds.

"20. That in August, 1952, the respondent refused to permit the appraisers appointed in this estate from securing eartag numbers and detailed descriptions of the cattle on his farm and later over the objections of the executrix and her attorneys appropriated to himself all of the milk checks, income, and produce from the cattle then on his farm belonging to this estate; that he also refused to surrender possession of said personal property to the executrix or her attorneys.

"21. That during the marriage of the parties the net income from milk produced on the Earl James farm amounted to $25,428.49 and the amount of income received for milk produced on the Ethel James farm amounted to $12,722.24.

"22. That except for the permanent improvements which were made to the two farms and the increase in farm personal property there are no tangible assets to indicate that there was any net profit from the operations of the farms over and above the living expenses of the family; that it does appear, however, that there are unpaid obligations for which claims have been filed in this estate for liens and accounts which were incurred either in the operation of the farms, for improvements to the farms or for purchases of cattle and machinery in the following amounts: . . . [sundry amounts] [Total = $8,434.43.]

"23. That by agreement of the parties in open court a public auction of all the farm personal property on the Earl James farm was held under the direction of Public Auction Service, Inc., of Fort Atkinson, Wisconsin, on February 3, 1953, and an auction on the Ethel James farm on or about March 2, 1953; that it was agreed by the parties that all of the personal property on the Earl James farm as shown by the inventory and appraisal should be sold at said auction and if any of the cattle were tested and found to be diseased that such cattle should be sold privately; that the said Earl James should by such agreement prepare the property on his farm for sale including four head of cattle which he purchased from his own funds subsequent to the death of Ethel James and that the proceeds from said four head of cattle less the auction expense should be paid over to the said Earl James.

"24. That the said Earl James failed to produce for sale at said auction four head of cattle and a team of horses; that it has not been determined specifically which four head of cattle were missing because the said Earl James refused to permit the appraisers to identify the livestock and the average appraisal valuation of all the livestock on the Earl James farm was $200 per head and that the loss sustained by the estate because of the respondent's failure to produce said cattle for sale was $800; that the appraisal valuation of the team of horses which respondent failed to produce for sale at said auction was $100.

"25. That the total sales price of the farm personalty sold at the Earl James auction belonging to the estate was $10,555.85 which left a net due the estate of $9,922.50 after deducting the auction commission and expense and from the balance there was paid the Marion Jacobs account then amounting to $2,195.57.

"26. That the respondent sold privately property belonging to said estate consisting of four cows, seven feeder pigs, two sows, six calves, silo filler, and a quantity of oats for $980.22 which amount has been deposited with this court and that respondent purchased at the auction for his own purposes personal property amounting to $441 and which amount has not been paid either to the Public Auction Service, Inc., or to the executrix of this estate.

"27. That while the farm personal property belonging to Ethel James was in the possession of respondent he received net milk checks plus addition of butter furnished for respondent's benefit the sum of $3,045.01. That the reasonable value of the services of respondent for taking care of the cattle from date of decedent's death to February 3, 1953, for cultivating and harvesting the crops, and for the rent of his premises for such period at the rate of $225 per month amounts to $1,425; that the reasonable charge for feed purchased from the Old Stone Mill by the respondent for the cattle during such period was $269.95 and for feed from Badger Land Co-op. the sum of $67; that the amount of $58.40 paid to Spencer Findley for labor is a reasonable charge; that the respondent paid out $150 to Woodrow Carnes for silo filling which is a reasonable charge; that he also paid out the sum of $218 to George Williams for custom work during such period and the same is a reasonable charge; that custom work of $100 done by Peyer Bros., and labor in the sum of $32 to Edward Howell preparing for auction are reasonable charges; that telephone charges of $4.63 were reasonably incurred and items of oil and gas used for farm operations amounting to $288.98 are reasonable charges; that veterinarian fees of $66 are reasonable expenses for such services and the sum of $40 for pasturage is also a reasonable and proper charge; miscellaneous charges of $28.64 including insurance are reasonable and proper.

"28. That the unjustifiable refusal of the respondent to turn over the cattle and other personal property on his farm to the executrix of this estate when demanded in August, 1952, resulted in a serious and substantial loss to the estate through a depressed market for cattle and secondhand machinery and by the consumption of feed and heavy expense in caring for the cattle without an income proportionate thereto.

"CONCLUSIONS OF LAW.

"1. That the personal property itemized in the inventory in the above-entitled estate and in the affidavit of the executrix dated November 19, 1952, are and were the property of said estate and the executrix was entitled to the immediate

possession of said property when demand for the surrender thereof was made upon the respondent in August, 1952.

"2. That the refusal of the respondent to surrender said property to the executrix at said time resulted in a substantial damage to said estate.

"3. That there was no agreement between decedent and the respondent, express or implied, whereby the respondent became entitled to or had any right, title, or interest in and to the farm personal property which was on either the Earl James or Ethel James farms during the married life of said parties.

"4. That the respondent early in 1948 advanced to decedent the sum of $1,500, a substantial part of which was used by her to purchase cattle for the farm herd; that such advance was not intended as a gratuity and that the respondent is entitled to credit for said sum by said estate.

"5. That the respondent is also entitled to a credit of $2,748.60 for his services in caring for the cattle, for the use of his farm and outbuildings, and for the expenses connected with the operation of said farm and the care of the personal property belonging to the estate from the death of Ethel James to February 3, 1953.

"6. That said respondent is indebted to the estate of Ethel James in the following amounts: For milk checks paid to him from September, 1952—February, 1953, inclusive, $3,045.01; for property purchased by him at the auction, $441; for four head of cattle missing from his farm, $800; for team of horses given away by respondent, $100; for property of the estate sold by him privately, $980.22. [Total] $5,366.23.

"7. That the sum of $980.22 being the last item above referred to was agreed upon by the parties as being due said estate and said amount is now on deposit with this court; that the estate is therefore entitled to the delivery of said amount by the court upon the entry of judgment herein; that the balance of credit due said estate from respondent is $4,386.01 and the amount of credit due respondent from said estate is $4,248.60, leaving a balance due said estate of $137.41.

"8. That all of the household furniture on the Earl James farm with the exception of a davenport and chair referred to in the findings of fact is the property of the respondent.

"9. That the claim heretofore filed in this estate by the respondent in the sum of $28,428 is disallowed except for the sum of $1,500 received by respondent on the R. Hoeppner note and which is referred to in paragraph 4 of these conclusions of law.

"10. That the estate is entitled to costs as provided by law."

An analysis of the record indicates that all of the court's findings of fact excepting only a portion of finding No. 24, were based upon competent evidence. The portion of finding not founded upon proper proof, is: "That the loss sustained by the estate because of the respondent's failure to produce said cattle for sale was $800."

This specific finding is amongst those attacked on this appeal. The court found that Earl James had failed to explain or account for four missing head of cattle. This finding is sustained by the evidence. However, the burden of proof to establish the kind of cattle missing and their value was upon the executrix. Kind and value were not established by the evidence appearing in the record. In its written opinion, the court in commenting upon this particular subject, said:

"Failure on the part of respondent to explain or account for these animals raises some interesting questions, . . .

"Are the unaccounted-for animals, calves, heifers, or cows? If this question is not or cannot be determined: What is the formula for determining their value? Upon whom rests the burden of proof with respect to these questions? Unless respective counsel have facts to present to aid in the answer to these questions, I shall have to indulge in some purely arbitrary determinations."

When allowing to the executrix a credit in the amount of $800, the court in fixing value of the four missing head of

cattle adopted as the measure of value the average of the price received for the sale of all cattle sold by the auction company as detailed in findings 23 and 24, and struck an average of approximately $200 per head, which amount the court employed as the standard of value for each of the missing animals.

Since identity in kind of the cattle unaccounted for was wanting, and in view of the failure of proof as to market value of the particular cattle involved, we are compelled to hold that such finding and its attendant conclusion were based upon conjecture and speculation. The judgment in such respect may not be permitted to stand.

Appellant also complains that the court's award of the personal property on the James farm to the executrix was based on finding contrary to the great weight of the evidence, as was also its allowance of only $1,500 to James on his claim for property and cash on hand at the time of the marriage and collected during marriage, in addition to $1,500 realized from repayment to him of a note. It is considered that there was also ample evidence to sustain the court's findings and conclusions in such respects. The weight and credibility were for the trial court. In its written opinion the trial court indicated that it placed little or no credence in the testimony of Earl James.

Appellant's counsel argues that since the parties entered into no formal agreement regarding their property holdings (including additions), the situation ought to be treated by the court as though two adjoining, but unrelated, farmers had mixed up their business affairs and that under the rules of equity a proportionate division of the property ought to be decreed. However, here the trial court was able to trace, define, and determine the precise interests of each of the parties. Under ch. 246, Stats. (Married Women's Act), she was legally empowered to keep her separate estate intact.

The court found that she had done so. The fact that the husband had engaged in some work in connection with her property gave him no right of ownership to the same. In *Feller v. Alden*, 23 Wis. 301, a wife had permitted the husband to occupy the homestead and he had spent time and labor on the farm. The husband claimed a right to certain farm products although no transfer of such had been made to him by the wife. The court found that he was not entitled to his claim and said (p. 304) :

"For, if the farm were really the separate estate of the wife, as we have already said, the statute expressly declares that she may hold and enjoy it, with the rents and profits, in the same manner and with the like effect as though she were unmarried. It would seem to follow from this, that she might cultivate the farm, and manage the personal property, by means of any agency which any other owner of such property might employ, and the produce thereof, with the increase of stock, would belong to her."

Although Earl James contended that he had made bank deposits from time to time for which the decedent, but not he, had received the benefit, the court was able to find only a deposit by him of the proceeds of a note repayment to him, and credited him with that item in this cause. Respondent does not upon this appeal challenge the court's action in this regard.

The court did not find that a resulting trust had been established. Such a trust must be established by clear and convincing proof. In *Hanus v. Jankowski* (1949), 256 Wis. 187, 40 N. W. (2d) 573, it was held to be the general rule that a conveyance on a consideration from a husband, parent, or other person, where title is taken in the name of the wife, child, or other natural object of the purchaser's bounty, generally does not raise and on the contrary, rebuts a resulting trust, and raises a presumption of a gratuitous settlement on the wife, child, or other object of the bounty.

Decedent had possession and control of the personal property on both farms. Possession is *prima facie* evidence of title to and ownership of personal property. 73 C. J. S., Property, p. 197, sec. 14. Possession of property is indicia of ownership and a rebuttable presumption exists that those in possession of property are rightly in possession. 73 C. J. S., Property, p. 211, sec. 17. Obviously, the trial court here was of a mind that Earl James by his evidence had not convincingly rebutted the presumption of Ethel James' ownership of the personal property.

For reason that the trial court was able to determine the exact interests of the decedent in the disputed property and because the court was not convinced by the evidence of any contribution on the part of Earl James in excess of $1,500, it is our considered opinion that the judgment of the trial court may not be disturbed except that the provision, "It is further adjudged and determined that Earl James is indebted to said estate in the following sums: . . . For four head of cattle missing from his farm, $800; . . ." shall be stricken and deleted from the judgment, and the total amount as found by the court for which Earl James is indebted to the estate shall be reduced by a sum of $800.

*By the Court.*—The judgment shall be modified so as to exclude the item of $800 charged against Earl James as indebtedness to the estate for the four missing cattle, and, as so modified, it is affirmed. No costs to be allowed to either party; appellant to pay clerk's fees.